# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JASON COURTEMANCHE, BRETT FORESMAN, JUAN RIOS, AND DENNIS WILLIAMS, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | Civil No. 4:24-cv-40030-MRG |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | |
| MOTOROLA SOLUTIONS, INC., CALLYO 2009 CORP., SHI INTERNATIONAL CORP., and COLONEL JOHN E. MAWN, JR.,[1] Interim Superintendent of the Massachusetts State Police, in his official capacity, | ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM AND ORDER

**GUZMAN, J.**

Plaintiffs, Jason Courtemanche, Brett Foresman, Juan Rios, and Dennis Williams,

individually and on behalf of a class or classes of similarly situated persons (hereinafter

"Plaintiffs") bring this action against Defendants, Motorola Solutions, Inc. ("Motorola Solutions")

and Callyo 2009 Corp. ("Callyo," together with Motorola Solutions, "Motorola"), SHI

International Corp. ("SHI")[2], and Colonel Geoffrey D. Noble, Superintendent of the Massachusetts

---

[1] Plaintiffs filed their complaint against John E. Mawn, Jr. ("Mawn"), who was interim Superintendent of the Massachusetts State Police at the time. Since Mawn is no longer Superintendent, this Court automatically substituted Geoffrey D. Noble, his successor in interest, for purposes of the official capacity claims. [ECF No. 44].

[2] Claims against SHI were previously dismissed by this Court. [ECF No. 68].

State Police ("MSP"), in his official capacity ("Defendant Noble"). Plaintiffs' Amended Complaint alleges that MSP, utilizing Motorola products/intercepting devices, unlawfully recorded Plaintiffs and failed to disclose these recordings in Plaintiffs' subsequent criminal prosecutions. [Am. Compl., ECF No. 8 ¶¶ 1–4]. Plaintiffs bring claims under 42 U.S.C. § 1983 ("Section 1983), Mass. Gen. Laws ch. 93A ("93A"), the Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99 ("Wiretap Act"), and common law breach of warranty theories. [Am. Compl. ¶¶ 63–110, 122–84]. Pending before the Court are Defendants' Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), [ECF Nos. 29, 53].

For the reasons that follow, Defendants' Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**, as summarized below:

| Count # | Cause of Action | Outcome of Motion |
|---|---|---|
| I | Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1983 (against Motorola and Callyo) | **GRANTED** |
| II | Violation of M.G.L. c. 93A for Unfair and Deceptive Acts or Practices (against Motorola and Callyo) | **DENIED** |
| III | Breach of Express Warranty (against Motorola and Callyo) | **GRANTED** |
| IV | Breach of Implied Warranty of Merchantability (against Motorola and Callyo) | **DENIED** |
| V | Breach of Implied Warranty of Fitness for Particular Purpose (against Motorola and Callyo) | **GRANTED** |
| VII | Violation of M.G.L. c. 272 § 99 (Wiretap Act) (against Motorola and Callyo) | **DENIED** |
| VIII | Violation of M.G.L. c. 272 § 99 (Wiretap Law) (against Defendant Noble/MSP) | **MOOT** |
| IX | Violation of Constitutional Rights (Sixth and Fourteenth Amendment) under 42 U.S.C. § 1983 (against Defendant Noble/MSP) | **DENIED** |

I.      **BACKGROUND**[3]

Motorola Solutions, a foreign corporation registered to do business in the Commonwealth of Massachusetts, manufactures and sells mobile devices and security software to a variety of consumers. [Am. Compl. ¶ 25]. Callyo is a wholly owned subsidiary of Motorola Solutions. [Id. ¶ 20]. This case involves two Motorola products: the "10-21" and "Mobile Body Bug" applications (together, the "Callyo apps") that Motorola sells exclusively to police departments and other law enforcement agencies to assist with investigations and community interactions. [Id. ¶¶ 25, 28; ECF No. 30 at 8[4]]. These applications, when coupled with a mobile telephone, are capable of intercepting, transmitting, receiving, amplifying, recording, storing, and reproducing oral communications. [Am. Compl. ¶ 28]. The two applications facilitate surreptitious recordings as they record without notice as a default setting. [See id. ¶ 66]. Motorola's marketing of 10-21 states that it is "hidden in plain sight technology [that] makes body wires a thing of the past" and that it comes with a "Conceal Camera Preview" feature which "[d]isables your video preview while streaming to avoid detection." [Id. ¶¶ 80–81].

Since in or around 2017, Motorola marketed, manufactured, sold, or otherwise procured Motorola "intercepting devices" and data-storage services to MSP. [Id. ¶ 29, 31]. Motorola adds that it also provides customers like MSP with a license and access to an online database to store, review, reproduce, and share secret recordings of oral communications. [Id. ¶¶ 31; ECF No. 30 at 8]. MSP granted Motorola a royalty-free, worldwide, non-exclusive license to use MSP's intercepted oral communications. [Am. Compl. ¶ 54]. This license allowed Motorola to process,

---

[3] On a motion to dismiss, the Court sets forth the facts taking as true all well-pleaded allegations in the complaint and drawing all reasonable inferences in the Plaintiffs' favor. See Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 17 (1st Cir. 2008).

[4] All pagination refers to ECF pagination rather than page numbers in the documents.

host, cache, store, reproduce, copy, modify, combine, analyze, and create derivative works from MSP's intercepted oral communications, and to communicate, transmit, and distribute these intercepted oral communications to third parties. [Id.]

The named Plaintiffs are four individuals residing in Worcester County, Massachusetts, who allege that, in connection with its police investigations, MSP used the Motorola products to secretly record Plaintiffs' oral communications without their consent and without first obtaining a warrant. [Id. ¶¶ 35–46]. Since in or about 2017, in at least 181 known situations, MSP brought criminal charges against individuals who they had secretly recorded using Motorola applications. [Id. ¶ 4]. These secret recordings were never produced to prosecuting agencies, and the existence of these secret recordings was not disclosed to Plaintiffs until March of 2023. [Id.]

During Plaintiffs' respective criminal cases, MSP failed to notify the prosecuting agencies about the existence of the secretly recorded statements. [Id. ¶ 4]. After a series of evidentiary hearings, in July 2024, Judge LoConto of the Fitchburg District Court granted a motion for a new trial brought by some of the 181 defendants, finding that MSP officers utilized the Callyo apps for evidentiary purposes and their secret recordings of defendants violated the Wiretap Act. [ECF No. 57-3 (Mem. & Order, Commonwealth v. Aponte, No. 2216CR000495, (Mass. Dist. Ct. July 8, 2024)].[5] In their criminal cases, Plaintiffs paid court costs, probation fees, mandatory assessments, fines, restitution, license-reinstatement fees, and other monies, may have performed community service in lieu of payments to the court, and lost property that was seized. [Am. Compl. ¶ 6].

---

[5] The Court takes judicial notice of this action and its filings. "It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 19 (1st Cir. 2004) (quoting Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990))). Further, "the jurisprudence of Rule 12(b)(6) permits courts to consider matters that are susceptible to judicial notice." Id. at 12 (citing In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15-16 (1st Cir. 2003)).

In or about 2017, Motorola met with representatives of MSP concerning its sale of intercepting devices and data-storage services to MSP. [Id. ¶ 50]. At these meetings, MSP informed Motorola that its intercepting devices, i.e. the Callyo apps, failed to comply with the Massachusetts two-party consent law (the Wiretap Act). [Id. ¶ 51]. Motorola did not modify the Callyo apps to bring them into compliance with Massachusetts law and continued to sell the apps to MSP. [Id. ¶ 52]. At a hearing on the Defendants' motions to dismiss, held on February 28, 2025, counsel for Motorola asserted Motorola declined to make any changes to its products after the 2017 meetings with MSP because it did not believe its products were in violation of the law. [Hr'g Tr. 21:3-9, ECF No. 70]. In or about June 2023, MSP's Division of Investigative Services conducted an audit of historic investigative recordings to determine whether members of the MSP failed to notify prosecuting agencies about the existence of such recordings that were made in furtherance of criminal investigations. [Am. Compl. ¶ 34]. As noted above, at least one Massachusetts court has found that MSP officers did in fact engage in such conduct. See Mem. & Order, Commonwealth v. Aponte, No. 2216CR000495 [ECF No 57-3]. In essence, Plaintiffs allege that the MSP, aided by Motorola, carried-out surreptitious audio and video recordings of Plaintiffs, in violation of their rights.

Plaintiffs filed the initial complaint on February 22, 2024. [ECF No. 1]. Plaintiffs then filed the present Amended Complaint on April 17, 2024. [Am. Compl.]. On February 27, 2025, this Court granted SHI's motion to dismiss [ECF No. 31] and dismissed all claims against SHI (Counts I, II, IV, VI and VII). [ECF No. 68]. Plaintiffs have eight surviving claims against Defendants. Six of the claims are against Motorola Solutions and Callyo and include conspiracy to violate Plaintiffs civil rights under 42 U.S.C. § 1983 (Count I), unfair and deceptive acts or practices under Chapter 93A (Count II), breach of express warranty (Count III), breach of implied warranty of

merchantability (Count IV), breach of implied warranty of fitness for particular purpose (Count V) and violations of Massachusetts Wiretap Act (Count VII). Plaintiffs also advance two claims against Defendant Noble: violations of Massachusetts Wiretap Act (Count VIII) and violations of Plaintiffs' constitutional rights secured by the Fifth, Sixth, and Fourteenth amendments under 42 U.S.C. § 1983 (Count IX).

Presently before the Court are Motorola Solutions, Callyo, and Defendant Noble's motions to dismiss filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [ECF Nos. 29, 53]. On November 27, 2024, the Plaintiffs voluntarily dismissed their Wiretap Act Violation Claim against Defendant Noble. [ECF No. 57 at 2].

## II.    LEGAL STANDARDS

"When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Ayyadurai v. Galvin, 560 F. Supp. 3d 406, 410 (D. Mass. 2021) (quoting Ne. Erectors Ass'n of BTEA v. Sec'y of Lab., Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir. 1995)). On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." Johansen v. United States, 506 F.3d 65, 68 (1st Cir. 2007) (quoting Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995), cert. denied, 515 U.S. 1144 (1995)). "If the party fails to demonstrate a basis for jurisdiction, the district court must grant the motion to dismiss." Id. The district court "must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor" when ruling on a Rule 12(b)(1) motion. Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010) (citing Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001)). A plaintiff cannot assert a proper jurisdictional basis "merely on unsupported conclusions or interpretations

of law" or "[s]ubjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts[.]" Murphy, 45 F.3d at 522 (citations omitted). In evaluating whether the party has met its burden of proof, the court "may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff's allegations." Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 37 (1st Cir. 2000).

"'A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is appropriate when the plaintiff lacks standing to bring the claim.'" Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 894 F.Supp.2d 144, 150 (D. Mass. 2012) (quoting Edelkind v. Fairmont Funding, Ltd., 539 F.Supp.2d 449, 453 (D. Mass. 2008)). "[A] plaintiff must have standing to bring each and every claim [they] assert[]." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (citing Pagan v. Calderon, 448 F.3d 16, 26 (1st Cir. 2006). "The Constitution limits the judicial power of the federal courts to actual cases and controversies" and the standing requirement stipulates that "[a] case or controversy exists only when the party soliciting federal court jurisdiction (normally, the plaintiff) demonstrates . . . a personal stake in the outcome of the controversy . . . ." Katz, 672 F.3d at 71 (first citing U.S. Const. art. III, § 2, cl. 1; then quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

"To satisfy the personal stake requirement, a plaintiff must establish each part of a familiar triad: injury, causation, and redressability." Katz, 672 F.3d at 71 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). The injury in fact must be "'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'" Id. (quoting Lujan, 504 U.S. at 560). "The requirement of an actual or imminent injury ensures that the harm has either happened or is sufficiently threatening; it is not enough that

the harm might occur at some future time. Id. (citing Lujan, 594 U.S. at 564). The element of causation requires the plaintiff to show a "sufficiently direct causal connection," between the "injury and the conduct complained of" such that the injury is "fairly . . . trace[able] to the challenged action of the defendant." Id. (citing Lujan, 504 U.S. at 560). "Because the opposing party must be the source of the harm, causation is absent if the injury stems from the *independent* action of a third party." Katz, 672 F.3d at 72–73 (emphasis added) (citing Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976)). The final element, redressability, requires the plaintiff to "show that a favorable resolution of her claim would likely redress the professed injury." Katz, 672 F.3d at 72.

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (citations omitted). "In resolving a motion to dismiss, a court should employ a two-step approach." Ocasio-Hernández v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011). "It should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as ... fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.'" Id. (alterations in original) (quoting Ashcroft v. Iqbal, 566 U.S. 662, 678 (2009)). "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." Id. Dismissal is appropriate if

the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)). Still, Plaintiffs' burden is relatively low as "[a] court may not disregard properly pled factual allegations even if actual proof of those facts is improbable. . . . Rather, the relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Afrasiabi v. Massachusetts, 272 F. Supp. 3d 256, 260 (D. Mass. 2017) (citing Ocasio-Hernández, 640 F.3d at 13).

## III.  DISCUSSION

### A.  Count I: Plaintiffs' Section 1983 Claim Against Motorola and Callyo

Plaintiffs' Section 1983 claim must be dismissed under Rule 12(b)(6) because they have failed to demonstrate that Motorola was the equivalent of a state actor.

First, the Court responds to Motorola's argument that Plaintiffs lack standing for their Section 1983 claim against the companies because they fail to allege an injury that is fairly traceable to Motorola's conduct. [ECF No. 30 at 9–19]. At the motion hearing on this matter, the Court indicated preliminarily that it agreed with this proposition. However, upon further review, the Court finds that Plaintiffs have sufficiently alleged a cognizable injury for their Section 1983 claim against Motorola.

As with any claim, Plaintiffs must establish that they have standing to bring a Section 1983 claim against Motorola by demonstrating injury, causation, and redressability. Plaintiffs argue that they have suffered injury through deprivation of their due process rights under the Fifth and Fourteenth Amendments. [Am. Compl. ¶¶ 73, 75]. Specifically, Plaintiffs' Amended Complaint can be construed to allege that they were prevented from investigating and implementing vital

defenses to their criminal cases because MSP used intercepting devices to secretly record them, used the recordings to bring criminal charges against them, then failed to produce these secret recordings during the Plaintiffs' criminal trials. [Id. ¶¶ 2, 4–5]. Plaintiffs also assert they have suffered losses of liberty and property. [Id. ¶¶ 6–8].

Plaintiffs' injuries for the Section 1983 claim are fairly traceable to Motorola's conduct because Motorola's products and services are the but-for cause of Plaintiffs' injuries, and causation is not broken by the intervening actions of MSP since MSP's violations of Plaintiff's rights were reasonably foreseeable to Motorola. Motorola argues that that MSP's actions of recording Plaintiffs without consent or a warrant and MSP's subsequent criminal charges against Plaintiffs are intervening causes that break the chain of proximate causation. [ECF No. 30 at 17–19]. While in many cases, "[w]hen the injury alleged is the result of actions by some third party, not the defendant, the plaintiff cannot satisfy the causation element of the standing inquiry." Katz, 672 F.3d at 76 (citing Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125 ,141–42 (2011)). The First Circuit is clear that "[a]n actor is responsible for those consequences attributable to *reasonably foreseeable* intervening forces, including the acts of third parties," Medeiros v. Town of S. Kingstown, 821 F. Supp. 823, 828 (D.R.I. 1993) (quoting Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989) (emphasis added). The issue comes down to a determination of proximate cause, which, "under § 1983[,] [is] governed by federal standards, which incorporate common law tort principles." Id. (citing Gutierrez-Rodriguez, 882 F.2d at 561). The First Circuit has discussed the import of intervening causes in a Section 1983 action:

> A negligent defendant will not be relieved of liability by an intervening cause that was *reasonably foreseeable*, even if the intervening force may have 'directly' caused the harm. An unforeseen and abnormal intervention, on the other hand, breaks the chain of causality, thus shielding the defendant from liability.

Gutierrez-Rodriguez, 882 F.2d at 561 (internal quotation marks and citations omitted) (emphasis added).

Here, the Court agrees that MSP's conduct was an intervening force but disagrees with Motorola that it relieves the companies of any liability under Section 1983 because Plaintiffs plausibly allege that MSP's conduct was reasonably foreseeable to Motorola. The key fact is the 2017 meeting between MSP and Motorola where MSP allegedly told Motorola that its applications were in violation of the Wiretap Act. [See Am. Compl. ¶¶ 50–52]. In the Amended Complaint, Plaintiffs allege that, after the meeting, Motorola "failed or refused to bring its intercepting devices into compliance with Massachusetts law, and it continued to sell its non-compliant intercepting devices to MSP." [Id. ¶ 52]. Counsel for Motorola did not dispute this statement during the hearing on this motion. Instead, he relied on Motorola's refusal to change its practices after the meeting to show that Motorola and MSP were not acting as part of a conspiracy to violate Plaintiff's rights because they disagreed on this issue. What Motorola does dispute is that the 2017 meeting provided it with enough information about MSP's conduct that it would have been aware that MSP was committing constitutional violations using the Callyo apps. [See Hr'g Tr. 19:21–21:2]. Drawing all inferences in favor of the Plaintiffs, the Court finds that it was reasonably foreseeable to Motorola that MSP officers would violate Plaintiffs rights because Plaintiffs allege that MSP relayed to Motorola that officers' conduct while using the apps' default settings was in direct violation of the Wiretap Act. It was likewise foreseeable that MSP officers would use the illegal recordings in bringing criminal charges against defendants like Plaintiffs because the main function of MSP is to investigate crime and enforce criminal law. That being said, "the First Circuit has made it clear that issues of foreseeability are generally for the jury." Medeiros, 821 F. Supp. at 828 (citing Springer v. Seaman, 821 F.2d 871, 876 (1st Cir. 1987)). The Court cannot at this

early stage of the case state that Plaintiffs would be unable to prove a set of facts that will provide a jury question on the issue of foreseeability.

However, Plaintiffs Section 1983 claim against Motorola fails for a different reason: Plaintiffs have not shown that Motorola acted under the color of state law. Section 1983 "is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights, such as . . . the Fourteenth Amendment's right to procedural due process." Gagliardi, 513 F.3d at 306. To succeed on a Section 1983 claim, a plaintiff must show that defendants acted under the color of state law, and that his or her conduct deprived plaintiff of rights secured by the Constitution or by federal law. Id. (citing Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997)). For a private entity, such as Motorola, to have acted "under color of state law, their actions must be 'fairly attributable to the State.'" Estades-Negroni v. CPC Hosp., 412 F.3d 1, 4 (1st Cir 2005) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)). To determine if a private entity's action is attributable to the state, the First Circuit has articulated "three tests: the public function test, the joint action/nexus test, or the state compulsion test." Alberto San Inc. v. Consejo De Titulares Del Condominio San Alberto, 522 F.3d 1, 4 (1st Cir. 2008) (citing Estades-Negroni, 412 F.3d at 5).

Plaintiffs advance their Section 1983 claim against Motorola under the joint action/nexus test. Plaintiffs' Amended Complaint alleges that Motorola and Callyo "acted under color of state law when they willfully participated in a *joint action* with MSP to deprive Plaintiffs of their constitutional rights." [Am. Compl. ¶ 71 (emphasis added)]. Under the joint action/nexus test, the private party may be viewed as a state actor only if "the totality of the circumstances reveals that the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].'" Estades-Negroni, 412 F.3d at 5 (alterations

in original) (quoting <u>Bass v. Parkwood Hosp.</u>, 180 F.3d 234, 242 (5th Cir. 1999)). Although the focus is on the totality of the circumstances, "the case law suggests some factors to which courts typically attach special weight" such as (a) whether the private actor "is (or is not) independent in the conduct of its day-to-day affairs," (b) the "circumstances surrounding a private entity's use of public facilities" and (c) whether the State and private actor "knowingly shared in the profits" created by the conduct at issue. <u>Perkins v. Londonderry Basketball Club</u>, 196 F.3d 13, 21 (1st Cir. 1999).

In support for their joint action theory, Plaintiffs allege that Motorola and Callyo "created, marketed and/or sold" applications to the MSP and provided an online database where the recordings were stored. [Am. Compl. ¶ 74, 31]. Further, Plaintiffs emphasize that as part of Motorola's contract with MSP, MSP granted Motorola a "royalty-free, non-exclusive license" that allowed Motorola to use the MSP recordings stored by Motorola's database for its own financial gain, such as by using the recordings to create derivative works and products. [Id. ¶ 54; ECF No. 47 at 12]. At baseline, Plaintiffs' allegation that Motorola is equivalent to a state actor because it has a contract with MSP is insufficient to save their claim: "[a] private party cannot be transformed into a state actor simply because it is paid with government funds for providing a service." <u>Santiago v. Puerto Rico</u>, 655 F.3d 61, 72 (1st. Cir 2011). Here, the relationship between the MSP and Motorola was a business contract where the state paid Motorola for their products and services. There are no allegations in the Amended Complaint that the relationship between Motorola and MSP was exclusive nor that Motorola's daily operations revolved solely around MSP. There is nothing in the Amended Complaint to establish that Motorola and MSP's contract "caused the Commonwealth to insinuate itself into the day-to-day operations" of Motorola. <u>See Santiago</u>, 655 F.3d at 71 ("The 'most salient' factor in [the joint action] determination 'is the extent to which the

private entity is (or is not) independent in the conduct of its day-to-day affairs.'" (quoting Perkins, 196 F.3d at 21)). Further, Plaintiffs allegations surrounding the Motorola database that is used to store MSP's recordings indicate this connection with MSP was also no more than a routine business service. Although Plaintiffs discuss a potential licensing agreement that would allow Motorola to "review, reproduce, analyze, and create derivative works and products," [Am. Compl. ¶ 54], there are no facts in the Amended Complaint that demonstrate that Motorola ever took any actions or made any profits with the recordings made by MSP, nor that Motorola shared any purported profits from the license agreement with the Commonwealth or the MSP. See Santiago, 655 F.3d at 72 ( a "state's sharing of profits generated from the private party's rights-depriving conduct" is a factor in the joint action analysis). Similarly, the Amended Complaint makes no allegations that Motorola ever used any of the State's public facilities or publicly owned equipment. See id. at 71. There is a lack of factual allegations demonstrating that there was a joint action/nexus between the Motorola and the state, and "[o]n this record, it cannot plausibly be said that the private defendants and the Commonwealth were so entangled as to render the private defendants state actors." See id. at 72.

For the reasons described above, the motion to dismiss Plaintiffs' Section 1983 claim (Count I) against Motorola and Callyo is **GRANTED.**

### B.    Supplemental Jurisdiction

This matter is before the Court under federal question jurisdiction, with Plaintiff's Section 1983 claims providing the jurisdictional hook. See 28 U.S.C. § 1331; [Am. Compl. ¶¶ 63–76, 154–184]. While the Court dismissed Plaintiffs' Section 1983 claim against Motorola, as discussed below, Plaintiffs' Section 1983 claim against MSP survives MSP's motion to dismiss. The Section 1983 claim against MSP continues to provide the federal question necessary for jurisdiction under

28 U.S.C. § 1331. "When a federal court may validly exercise federal-question jurisdiction over at least one claim, it may also exercise supplemental jurisdiction over pendent state-law claims." Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 19 (1st Cir. 2018) (citing Cavallaro v. UMass Mem'l Healthcare, Inc., 678 F.3d 1, 9 (1st Cir. 2012)). When a federal claim is pending before a court, that court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). In other words, supplemental jurisdiction over state-law claims is appropriate where the state-law claims, and the anchoring federal claim arise from "the same nucleus of operative facts." Lawless, 894 F.3d at 19; Cavallaro, 678 F.3d at 9. "This remains true even when the federal claims are against a separate party." Audette v. Carrillo, No. 15-cv-13280-ADB, 2017 U.S. Dist. LEXIS 37962, at *8 (D. Mass. Mar. 16, 2017) (citing Irizarry-Santiago v. Essilor Indus., 929 F. Supp. 2d 30, 34 (D.P.R. 2013) (exercising supplemental jurisdiction over one defendant is appropriate when the claims arose from the same "nucleus" of facts as federal claims against another defendant)).

Plaintiffs' claims, collectively, arise from the same nucleus of operative fact that begins with Motorola's manufacturing of the Callyo apps and its contract with MSP and extends to MSP's alleged violations of Plaintiffs' constitutional rights through usage of the Callyo apps. With Plaintiffs' Section 1983 claim against MSP remaining, the Court has supplemental jurisdiction over the state-law claims against Motorola pursuant to 28 U.S.C. § 1367.

### C.    Count II: Plaintiffs' Chapter 93A Claim Against Motorola and Callyo

Chapter 93A prohibits "'[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" Valley Children's Hosp. v. Athenahealth, Inc., No. 22-cv-10689-DJC, 2023 WL 6065800 at *2 (D. Mass. Sept. 18, 2023) (quoting Mass.

Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005)); Mass. Gen. Laws ch. 93A, § 2(a). Although "indirect purchasers can bring a cause of action under [Chapter] 93A," Ciardi v. F. Hoffmann La Roche, Ltd., 762 N.E.2d 303, 313 (Mass. 2002), to properly allege a claim under Chapter 93A § 9, a plaintiff must demonstrate that "some business, commercial, or transactional relationship" exists between the plaintiff and the defendant. Ryan v. Greif, Inc., 708 F. Supp. 3d 148, 179 (D. Mass. 2023) (quoting Steinmetz v. Coyle & Caron, Inc. (In re Steinmetz), 862 F.3d 128, 141 (1st Cir. 2017)). While consumer actions under § 9 have a "lower burden in establishing a commercial relationship than an action between two businesses under [§] 11[,]" a commercial link must still exist between the plaintiff consumer and the defendant engaged in commerce. Id. (citing Begelfer v. Najarian, 409 N.E.2d 167, 190–191 (1980)).

Further, to succeed on a Chapter 93A claim, the Plaintiffs "must show '(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury.'" Gottlieb v. Amica Mut. Ins. Co., 57 F.4th 1, 10 (1st Cir. 2020) (quoting Tomasella v. Nestle USA Inc., 962 F.3d 60, 71 (1st. Cir. 2020)). "[I]n order to obtain relief under [Chapter 93A] for either an unfair or deceptive act, plaintiffs must show that they were injured by the conduct at issue, and that the conduct caused some loss beyond the mere fact that a violation occurred." Gottlieb, 57 F.4th at 10.

As discussed below, the Court finds Plaintiffs have adequately alleged each element for their 93A claim. To start, the Court finds Plaintiffs have established that Motorola engaged in an unfair act or practice in Massachusetts commerce in two ways: first, by promoting and selling a product that foreseeably encouraged illegal conduct, "i.e. the secret interception and recording of oral communications in Massachusetts," [Am. Compl. ¶ 79]; and second, under a theory of regulatory compliance where Plaintiffs allege that, after the 2017 meeting with MSP, Motorola

knowingly sold and marketed legally noncompliant products in the Commonwealth, and where, even after learning of its products' noncompliance with the Wiretap Act, Motorola failed to initiate a recall or otherwise modify the products to comply with the law, [Id. ¶¶ 50–52, 77–88].

When assessing whether a practice is unfair, the First Circuit directs this Court to consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Gottlieb, 57 F.4th at 9 (quoting Mass. Eye & Ear, 412 F.3d at 243 (alterations in original)). "If all three factors are present, the challenged conduct will surely violate [Chapter 93A] . . . ." Sinicrope v. Keller Indus., No. 95-30002-MAP, 1997 U.S. Dist. LEXIS 2877, at *16 (D. Mass. Mar. 13, 1997) (quoting PMP Assoc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)). The factors named by the First Circuit and state case law are articulated as discretionary (i.e. the court must "consider" the factors), and it is not settled law that all three factors are required to establish an unfair practice. Plaintiffs meet factors (1) and (2): Motorola's alleged conduct was within the penumbra of unfair conduct established by statute, namely the Wiretap Act, and once Motorola was put on notice of such by MSP in 2017, [Am. Compl. ¶ 50–52], it was unethical and unscrupulous for Motorola to continue to market and sell the Callyo apps without remedying the apps' noncompliance, despite notice that use of the apps was resulting in unlawful conduct due to its default setting of recording without notice.

Having established that Plaintiffs plausibly alleged that Motorola engaged in unfair conduct, the Court now turns to Plaintiffs' legal theory, which is recognized as a regulatory noncompliance theory. In Iannacchino, the Supreme Judicial Court of Massachusetts ("SJC") considered plaintiffs' 93A claim based on a theory of regulatory noncompliance. 888 N.E.2d 879

(Mass. 2008). The <u>Iannacchino</u> plaintiffs were a putative class of Massachusetts residents who owned vehicles produced by the defendant-auto manufacturer (Ford Motor Co., "Ford"), and claimed that the outside door handle systems in their vehicles were noncompliant with applicable federal safety standards. <u>Id.</u> at 882. The plaintiffs claimed that the Ford's alleged practice of knowingly manufacturing, offering for sale, and refusing to recall vehicles that did not comply with federal safety regulations was unfair or deceptive. <u>Id.</u> The plaintiffs also brought a claim for breach of implied warranty under the same theory. <u>Id.</u> In the case, the SJC noted that the Federal Safety Act, 49 U.S.C. § 30115(a), requires that all automobile manufacturers selling new cars in the United States certify that their products comply with federal safety standards. <u>Id.</u> at 886. In framing its analysis, the SJC noted "a claim, supported by sufficient factual allegations, that the plaintiffs own vehicles manufactured and sold by Ford as meeting required government safety standards; that the vehicle's door handles, as Ford knew, failed to comply with NHTSA safety standards; and that the noncompliance was not properly remedied, would support a cause of action under G. L. c. 93A, § 9." <u>Id.</u> As a result, the SJC reasoned that "the purchase price paid by the plaintiffs for their vehicles would entitle them to receive vehicles that complied with those safety standards or that would be recalled if they did not comply." <u>Id.</u> The SJC emphasized that particular consideration should be paid to the defendant-manufacturer's knowing sale of a product that was not in compliance with the law. <u>Id.</u> ("If Ford knowingly sold noncompliant (and therefore potentially unsafe) vehicles or if Ford, after learning of noncompliance, failed to initiate a recall and to pay for the condition to be remedied, the plaintiffs would have paid for more (viz., safety regulation-compliant vehicles) than they received."). Ultimately, the SJC concluded that plaintiffs' 93A claim failed because their complaint did not adequately allege that their vehicles actually failed to comply with the federal safety standards. <u>Id.</u> at 888. However, the SJC's

articulation of what allegations would suffice to state a claim of unfair or deceptive conduct under a regulatory compliance theory stands, and this Court finds Plaintiffs' allegations meet this burden. Namely, Plaintiffs' state sufficient allegations to establish that Motorola's conduct in knowingly manufacturing, offering for sale, and refusal to recall its Callyo applications that did not comply with Massachusetts law was unfair.

Motorola argues that Plaintiff's assertion that the Callyo applications violate the Wiretap Act is negated by the fact that other jurisdictions with two-party consent laws like the Massachusetts Wiretap Act utilize these apps without similar legal challenges. [Hr'g Tr. 21:3–4]. "[W]hile adherence to industry standard or custom is one factor that can support a finding of no liability under Chapter 93A, . . . the existence of an industry-wide practice does not itself constitute a complete defense to a Chapter 93A claim." Blue Cross & Blue Shield v. AstraZeneca Pharms. LP (In re Pharm. Indus. Average Wholesale Price Litig.), 582 F.3d 156, 185 (1st Cir. 2009) (citing James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1251 (1st Cir. 1997); Commonwealth v. DeCotis, 316 N.E.2d 748, 753 (Mass. 1974)). Further, Motorola's potential liability here is premised on Motorola's conduct relating specifically to sales in the Commonwealth to MSP and is inherently fact-specific to the boundaries of this jurisdiction.

Regarding the requirement for a commercial relationship, plaintiffs suing under Chapter 93A Section 9 can include indirect purchasers of upstream defendants' products. Ciardi, 762 N.E.2d at 309-10; Moniz v. Bayer Corp., 484 F. Supp. 2d 228, 230 (D. Mass. 2007). "The language of G. L. c. 93A, §§ 1, 9(1), allows *any* person who has been injured by trade or commerce *indirectly* affecting the people of this Commonwealth to bring a cause of action." Ciardi, 762 N.E2d at 309 (emphasis in original). Furthermore, "there is no requirement of contractual privity between the plaintiff and the defendants under G. L. c. 93A, § 9." Id. at 310 (citing Kattar v. Demoulas, 739

19

N.E.2d 246, 258 (Mass. 2000) ("Parties need not be in privity for their actions to come within the reach of c. 93A")). However, "even for a claim brought under section 9," "some business, commercial, or transactional relationship is required[.]" In re Steinmetz, 862 F.3d at 141.

Plaintiffs can meet their burden on the commercial relationship requirement because, although they are not direct purchases of Motorola's products, Chapter 93A permits a cause of action for cases where a defendant has an indirect effect on the people of the Commonwealth. In Ryan, this Court granted a motion to dismiss a 93A claim where the defendant "did not participate, directly or indirectly, in the marketing, production, or sale of [the unfair] products," nor did the defendant gain any benefit from another defendant's unfair and deceptive conduct. 708 F. Supp. 3d at 184. In that order, the Court distinguished the Ryan facts from the facts of Ciardi and Moniz. In this case, the facts are more analogous to those two cases, as compared to the facts of Ryan. Similarly to the defendant in Ciardi, Motorola manufactured, produced, distributed, and sold the products at issue. See Ciardi, 762 N.E.2d at 306. Further, in Moniz, the court found the requisite commercial relationship even where the defendants were upstream manufacturers of raw materials that were later incorporated into finished consumer goods by other industrial manufacturers. Moniz, 484 F. Supp. 2d at 230–31. Motorola is not only the upstream manufacturer of the products at issue here, it also directly engages in marketing and sales of those products, which is a facet of commerce that indirectly affects the Plaintiffs. See Ciardi, 762 N.E2d at 309. Alternatively, the Plaintiffs establish the commercial link with Motorola, albeit indirectly, by virtue of MSP's contract with Motorola. While Plaintiffs are not direct purchasers of the Motorola products at issue, the MSP-Motorola commercial contract was undertaken by a state agency purportedly working in service of the public, including Plaintiffs.

Plaintiffs have also articulated a cognizable injury under Chapter 93A. Here, the Plaintiffs allege numerous injuries: (A) the infliction of emotional distress, [Am. Compl. ¶¶ 84–87];  (B) loss of liberty and freedom through their criminal trials, [id. ¶ 88]; (C) loss of money due to expenses, fines, and fees with connection with their criminal proceedings, [id.]; (D) the violation of their right to privacy through secret recordings in violation of the Wiretap Act [id. ¶ 129]: and (E) the ongoing and illicit use by Motorola of these recordings through its ability to store and review recordings, [id. ¶¶ 53–54]. Because the Plaintiffs have claimed multiple injuries, this Court will evaluate each one.

The Plaintiffs first allege that they have suffered infliction of emotional distress. [Id. ¶¶ 84–87]. However, this allegation is nothing more than a legal conclusion. In fact, the only reference that the Amended Complaint makes to the infliction of emotional distress "merely parrot the elements of the cause of action." Ocasio-Hernández, 640 F.3d at 12. Because the Amended Complaint makes no factual allegations supporting any infliction of emotional distress, this Court may not consider the injury. See id. The same result is required for Plaintiffs' allegations of Motorola's ongoing use of the secret recordings. Plaintiffs have not proffered any facts that Motorola is actually using or profiting off the recordings stored in the cloud. Regarding Motorola's alleged violation of the Wiretap Act, this injury is insufficient because the First Circuit has held "the violation of an independent statute such as Chapter 272, § 99 [the Wiretap Act], does not itself 'satisf[y] the injury requirement of c. 93A'" Walsh v. TelTech Systems, Inc., 821 F.3d 155, 161 (1st Cir. 2016) (alterations in original) (quoting Tyler v. Michaels Stores, Inc., 984 N.E.2d 737, 744 (Mass. 2013)). Instead, Plaintiffs must allege that they have, "as a result [of the 93A violation], suffered a *distinct* injury or harm that arises from the claimed unfair or deceptive act," Walsh, 821 F.3d at 161 (alterations in original) (quoting Tyler, 984 N.E.2d at 745–46).

The remaining injuries that Plaintiffs allege are the loss of liberty and freedom through their criminal trials and the loss of money associated with such trials – in other words, violations of their constitutional right to procedural due process. [Am. Compl. ¶ 88]. The Court finds that Plaintiffs' complained injury of a violation of their constitutional right to due process is cognizable under Chapter 93A because constitutional violations are treated as personal injury claims, and personal injuries caused by an unfair or deceptive act are recoverable under Chapter 93A, "even if the consumer lost no 'money' or 'property.'" Hershenow v. Enter. Rent-A-Car Co. of Bos., 840 N.E.2d 526, 533 (Mass. 2006) (quoting Haddad v. Gonzalez, 576 N.E.2d 658, 664 (Mass. 1991)). Here Plaintiff's injuries are the same as alleged in their Section 1983 claim. In Wilson v. Garcia, the Supreme Court held that Section 1983 claims are best characterized as tort actions for the recovery of damages for personal injuries. 471 U.S. 261, 276 (1985) (considering the purpose and history of Section 1983). While noting concerns about the broadness of the Supreme Court's approach, another session of this Court held that a Section 1983 claim alleging a violation of procedural due process should be treated as a claim for "personal injury" under Massachusetts law. Pomeroy v. Ashburnham Westminster Reg'l Sch. Dist., 410 F. Supp. 2d 7, 13–14 (D. Mass. 2006). Given that a claim alleging a violation of a plaintiff's constitutional right to procedural due process is properly characterized as a claim for personal injury, and personal injury is a recoverable loss for Chapter 93A even without economic loss, it logically follows that Plaintiffs have met the injury prong of their 93A claim.

Furthermore, the SJC has held that "[i]f any person invades a consumer's legally protected interests, and if that invasion causes the consumer a loss -- whether that loss be economic or noneconomic -- the consumer is entitled to redress under [Chapter 93A]." Hershenow, 840 N.E.2d

at 535.[6] Rights enshrined by the Constitution, including the right to procedural due process, are unequivocally legally protected interests. While Plaintiffs argue they have incurred economic losses in the fines they paid in their criminal cases, [Am. Compl. ¶ 88], even if they do not show actual damages, "under circumstances where there has been an invasion of a legally protected interest, but no harm for which actual damages can be awarded," Chapter 93A, § 9(3) provides for the recovery of minimum damages in the amount of $25." Leardi v. Brown, 474 N.E.2d 1094, 1101 (Mass. 1985). Therefore, Plaintiffs would be entitled to nominal damages even where no actual damages are shown. Id.

Similarly to this Order's analysis of injury for Plaintiff's Section 1983 claim against Motorola, *supra*, Plaintiffs meet their burden to show that Motorola's unfair conduct was the factual and proximate cause of the alleged violation of their constitutional rights. See Walsh, 821 F.3d at 160 ("A plaintiff's failure to establish both factual causation and proximate causation is fatal to her Chapter 93A claim." (citations omitted)). In cases analyzing allegations of deceptive conduct under 93A, the SJC has held that "plaintiffs need not show proof of actual reliance on a misrepresentation in order to recover damages under G.L. c. 93A . . . . Rather, '[w]hat the plaintiff[s] must show is a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception.'" Iannacchino, 888 N.E.2d at 886 n.12 (first citing, Slaney v. Westwood Auto, Inc., 322 N.E.2d 768 ( Mass. 1975); then quoting, International Fid. Ins. Co. v. Wilson, 443 N.E.2d 1308, 1314 (Mass. 1983)). As a plaintiff's actual reliance on a misrepresentation is not required for a claim of deceptive conduct, it follows that a claim for unfair

---

[6] The Court notes that "for there to be the invasion of a legally protected right [under Chapter 93A,] the plaintiff must establish that the defendant acted intentionally or knowingly." Haddad, 576 N.E.2d at 669. Here, Plaintiffs meet that threshold with their allegation that Motorola knew that the apps were out of compliance with Massachusetts law once MSP raised the issue.

conduct regarding the marketing and sale of a product does not require that Plaintiff is an actual purchaser of a defendant's product. This is further supported by Chapter 93A's authorization of a private right of action for people *indirectly* affected by a defendant's unfair and deceptive conduct. See discussion of commercial link requirement, *supra*.

Motorola's unfair conduct under the regulatory noncompliance theory articulated above was the factual, or "but-for" cause of Plaintiffs' injuries. But-for Motorola's manufacturing and sale of the Callyo apps, not to mention its failure to recall or modify those products, MSP officers would not have been able to make the covert recordings of the Plaintiffs in the first place. The question is not whether MSP officers would have otherwise made covert recordings of the Plaintiffs with a different technology. That is not before the Court. The Amended Complaint refers specifically to Motorola products used by MSP -- 10-21 and Mobile Body Bug -- and the resulting recordings stored on Motorola's cloud. The named applications' default settings to record without notice to the subjects being recorded created the conditions for violations of the Wiretap Act and Plaintiffs' due process rights. Motorola's products were the actual tool MSP officers utilized to enact the violations of Plaintiffs' rights.

Further, much like the analysis of Plaintiff's Section 1983 injury, the key question for proximate causation under 93A is whether the Plaintiffs' injury was a foreseeable result of Motorola's conduct, and the Court finds that it was. As stated previously, after the 2017 meeting between Motorola and MSP where MSP informed Motorola that the Callyo apps did not comply with the Wiretap Act, it became foreseeable to Motorola that MSP officers were using the apps to make covert recordings in criminal investigations. MSP's main function is to investigate crime and enforce criminal laws. Motorola specifically marketed the applications in question to law enforcement agencies and advertise the products as "hidden in plain sight technology [that] makes

body wires a thing of the past," highlighting features of the 10-21 app that disable users' video preview while streaming "to avoid detection." [Am. Compl. ¶¶ 80–81]. In Kaur v. World Bus. Lenders, LLC, the Massachusetts District Court denied a motion to dismiss a 93A claim where it found that defendant-bank should have foreseen an unacceptable probability of its predatory loan's failure because, in part, the lender "should have recognized at the outset that the plaintiffs were unlikely to be able to repay the loan." 440 F. Supp. 3d 111, 124 (D. Mass. 2020). Motorola should have recognized, after the 2017 meeting with MSP, that the default record setting of the Callyo apps was resulting in MSP officers secretly recording members of the public in pursuit of criminal investigations, particularly because that is exactly how Motorola marketed and sold these products to its target customers: law enforcement agencies. Further, it is a reasonable inference at the motion to dismiss stage that Motorola's failure to recall or modify the products would foreseeably result in such actions continuing unabated.

The Court pauses to note that Plaintiffs' allegations regarding Motorola's actual or constructive knowledge that MSP's secret recordings were resulting in constitutional violations and the extent to which Motorola could foresee these violations are just barely enough to cross into "plausibility" required to state a claim at a motion to dismiss. However, sufficient information to withstand summary judgment may only come after further details about the 2017 meeting are revealed in discovery. At the motion to dismiss stage, "a complaint does not have to evince a 'one-to-one relationship between any single allegation and a necessary element of the cause of action.'" A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 82 (1st Cir. 2013) (quoting Rodrígues-Reyes v. Molina-Rodríguez, 711 F.3d 49, 55 (1st Cir. 2013). "The critical question is whether the claim, viewed holistically, is made plausible by 'the cumulative effect of the factual allegations' contained in the complaint." Id. (quoting Ocasio-Hernández, 640 F.3d at 14). Plaintiffs have

alleged enough to make a plausible Chapter 93A claim against Motorola, and Motorola/Callyo's motion to dismiss Count II is **DENIED**.

### D.    Count III: Breach of Express Warranty Claim Against Motorola and Callyo

To state a claim for breach of express warranty under Massachusetts law, the Plaintiffs must prove "'that the defendant promised a specific result' and that defendant failed to deliver on his promise and, therefore, breached the express warranty." Jackson v. Johnson & Johnson & Jannsen Pharms. Inc., 330 F.Supp.3d 616, 627 (D. Mass. 2018) (quoting Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc., 489 N.E.2d 172, 175 (Mass. 1986)). The Amended Complaint must therefore allege a plausible factual basis to conclude that Motorola made a promise that it would comply with all laws.

Although the Amended Complaint states that "Motorola/Callyo expressly warranted that it would comply with applicable laws," it fails to make any factual allegations that support that Motorola/Callyo made express promises or to whom these promises were made. [Am. Compl. ¶ 92]. Plaintiffs' statement is nothing more than a legal conclusion couched as a fact. Furthermore, the factual allegations made in the complaint simply state that "MSP informed Motorola/Callyo that its intercepting devices failed to comply with the Massachusetts two-party consent law" and that "Motorola/Callyo failed or refused to bring its intercepting devices into compliance." [Id. ¶¶ 51–52]. Notably absent from these allegations are any facts that Motorola/Callyo promised to bring their devices into compliance. [See id.] Because the Amended Complaint fails to allege any promises made by the Defendants, the motion to dismiss Plaintiffs' breach of express warranty claim against Motorola and Callyo is **GRANTED**.

### E.    Count IV: Breach of Implied Warranty of Merchantability Claim Against Motorola and Callyo

Plaintiffs' claim against Motorola for breach of implied warranty of merchantability is essentially based on the same regulatory noncompliance theory as their Chapter 93A claim, namely, that Motorola impliedly warrantied that the Callyo apps "would comply with Massachusetts law," but the apps failed to comply with the Massachusetts Wiretap Act. [See Am. Compl. ¶¶ 98–99]. The SJC has held that when an implied warranty claim and a Chapter 93A claim are based on the same "theory of injury and the same set of alleged facts, they should survive or fail under the same analysis." Iannacchino, 888 N.E.2d at 889 ("in view of the interconnected nature of the plaintiffs' c. 93A and breach of implied warranty claims," the reasons that support the outcome of the Chapter 93A claim also warrant the same outcome for the breach of implied warranty claim). On this basis alone, Plaintiffs implied warranty claim could stand, as the Court has found their Chapter 93A claim survives Motorola's motion to dismiss. However, for the sake of clarity, the Court will do a full analysis of Plaintiffs breach of implied warranty claim.

Under Massachusetts law, "[a] seller breaches its [implied] warranty obligation when a product that is defective and unreasonably dangerous, for the [o]rdinary purpose' for which it is fit causes injury." Haglund v. Phillip Morris, Inc., 847 N.E.2d 315, 322 (Mass. 2006) (internal citations and quotation marks omitted). A product's "ordinary purpose" is encompassed by the product's "intended and foreseeable uses." Id. (citing Back v. Wickes Corp., 378 N.E.2d 964, 969 (Mass. 1978). A product's "fitness" depends primarily, but not exclusively, on "reasonable consumer expectations." Id. (citing Back, 378 N.E.2d at 970). The "relevant inquiry" for both ordinary purpose and fitness "focuses on the product's feature, not the seller's conduct." Haglund, 847 N.E.2d at 322 (citation omitted). Once again, foreseeability is a key consideration for liability, as "the manufacturer is not expected to design against 'bizarre, unforeseeable accidents,'" but "the manufacturer will be liable if its 'conscious design choices' fail to anticipate the reasonably

foreseeable risks of 'ordinary' use." Id. at 322–23 (quoting Back, 378 N.E.2d at 970). While many implied warranty claims are brought by direct consumers of a defendant's products, there is no requirement of privity when "the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or *be affected by the goods*." Mass. Gen. Laws ch. 106, § 2-318 (emphasis added). As Plaintiffs are bringing an implied warranty of merchantability claim based on a defective design, they must plead facts sufficient to allege that:

> (1) the defendant manufactured or sold the product that eventually injured [them]; (2) the product had a defect or otherwise unreasonably dangerous condition such that it was unsuited for the ordinary use for which it was sold; (3) [they were affected by] the product . . . in a manner that was at least foreseeable to the defendant; and [4] the defect or unreasonably dangerous condition was a legal cause of the their injury."

Taupier v. Davol, Inc., 490 F.Supp.3d 430, 439–40 (D. Mass. 2020); Mass. Gen. Laws ch. 106, § 2-318; Zoll Medical Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101, 107 (D. Mass. 2021).

Plaintiffs have put forth sufficient allegations that Motorola "manufactured or sold the product that eventually injured [them]." Taupier, 490 F.Supp.3d at 439. Here, the Plaintiffs allege that "Motorola/Callyo marketed, manufactured, sold and otherwise procured intercepting devices and data-storage services to MSP," [Am. Compl. ¶ 29], and that "MSP secretly recorded an oral communication by [Plaintiffs] using a Motorola/Callyo device," [id. ¶¶ 35, 38, 41, 45]. The product in question is the Callyo apps. [Id. ¶ 98–99]. Following the same theory as their 93A claim, Plaintiffs' "eventua[l]" injury is the violation of their constitutional rights. See Taupier, 490 F.Supp.3d at 439; [Am. Compl. ¶ 101]. Further, unlike with Chapter 93A, Plaintiffs are not barred from alleging their injury under implied warranty theory is the Motorola's violation of Plaintiffs' rights under the Wiretap Act. Therefore, Plaintiffs have satisfied the first requirement in showing that Motorola manufactured or sold the product that eventually injured them.

Plaintiffs next must allege that the Callyo apps "had a defect . . . such that [they were] unsuited for the ordinary use for which [they were] sold." Taupier, 490 F.Supp.3d at 439. Plaintiffs allege that the Callyo apps had a defect in that the apps would "record by default" without notice. [Am. Compl. ¶¶ 180–81; id. ¶¶ 79–81 (alleging Motorola marketed 10-21 as "hidden in plain sight technology [that] makes body wires a thing of the past," and that the app was designed to "avoid detection.") (alteration in original)]. Plaintiffs allege, and Motorola concedes, that Motorola sells the Callyo apps "exclusively to police departments and other law enforcement agencies to assist with investigations and community interactions." [ECF No. 30 at 8; Am. Compl. ¶¶ 25, 28–29]. Given that Motorola's primary market for the Callyo apps is agencies that enforce the law, it is reasonable to infer that the ordinary purpose of the apps includes that the apps comply with Massachusetts laws. "Fitness" is a question that depends, primarily but not exclusively, on consumer expectations. Haglund, 847 N.E.2d at 322 (citing Back, 378 N.E.2d at 970). Just as a diner consuming food served at a restaurant reasonably expects that the "food shall be fit to eat," a consumer reasonably expects that a product sold to law enforcement complies with legal standards in the jurisdiction. Cf. Friend v. Childs Dining Hall Co., 120 N.E. 407, 408–09 (Mass. 1918) (finding that when a restaurant serves food it creates an implied warranty of merchantability that the food is fit for consumption and will meet food safety standards). Thus, Plaintiffs have alleged that the Callyo apps' default record setting was a defect that made the products unfit for their ordinary use in law enforcement because the apps did not comply with Massachusetts' two-party consent law. [See Am. Compl. ¶¶ 51, 65–66, 179–80]. This is sufficient to meet the second element of Plaintiffs' implied warranty claim.

The third element of the implied warranty of merchantability claim requires Plaintiffs to show that they were affected by Motorola's Callyo apps "in a manner that was at least foreseeable

to the defendant." Taupier, 490 F.Supp.3d at 440; see Mass. Gen. Laws ch. 106, § 2-318. Here, Plaintiffs' Amended Complaint provides factual allegations that Motorola knowingly and intentionally entered into business with MSP regarding the Callyo apps, [Am. Compl. ¶¶ 50–51, 64–68], and that the purpose of the apps was to enable MSP to covertly make audio and video recordings, [id. ¶ 79–81]. For the same reasons as detailed in the Chapter 93A section, *supra*, after the 2017 meeting between Motorola and MSP, it was clearly foreseeable to Motorola that its apps were out of compliance with the Wiretap Act because MSP told the company so. [Id. ¶ 64–67]. At the hearing on the motion to dismiss, counsel for Motorola admitted that the 2017 meeting occurred, that MSP told Motorola the apps did not comply with Massachusetts law, and that Motorola refused to make any changes to the app because it disagreed with MSP that the app violated the law. [Hr'g Tr. 22:13–17 ("the Mass State Police said, We want you to change the default setting. And Motorola said, That's not how we build these things. We're not going to do it.")]. It is a reasonable inference that Motorola would have been put on notice at the time of the meeting that MSP was – intentionally or unintentionally – making covert recordings of subjects in criminal investigations. Therefore, it was foreseeable that Motorola's defective apps would "affect" Plaintiffs, who are Massachusetts residents and who were subjects of criminal investigations by MSP. Motorola's defiant refusal to bring the Callyo apps into compliance with the law indicates that the apps' default record feature was a "conscious design choice" that "fail[ed] anticipate the reasonably foreseeable risks of ordinary use." Haglund, 847 N.E.2d at 322 (citation omitted). Thus, there are sufficient factual allegations to support the third element of Plaintiffs' claim.

The final requirement that Plaintiffs must plead for their implied warranty of merchantability claim is that the Callyo apps' defect "was a legal cause of the plaintiff's injury."

Taupier, 490 F.Supp.3d at 440 (citations omitted). The language of this element makes clear that the defect need not be the only or even primary cause of Plaintiffs' injury – it simply must be "*a legal cause.*" Id. (emphasis added). For the same reasons that Plaintiffs can establish Motorola's conduct caused their constitutional injuries for the Chapter 93A claim, Plaintiffs have shown that the Callyo apps' default record setting was a legal cause of their implied warranty injury. The apps engendered MSP's covert recordings of the Plaintiffs. Thus, Plaintiffs meet their burden on the fourth element of their claim.

As Plaintiffs have put forth sufficient allegations to state a claim for implied warranty of merchantability against Motorola, the motion to dismiss Count III is **DENIED**.

### F.    Count V: Breach of Implied Warranty of Fitness for Particular Purpose Claim Against Motorola and Callyo

Plaintiffs fail to allege sufficient facts to support their claim for implied warranty of fitness for a particular purpose. "The warranty of fitness for a particular purpose is similar to the warranty of merchantability but applies only 'where the seller at the time of contracting has reason to know any particular purpose for which the goods are required, and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods.'" Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc., 573 F. Supp. 2d 372, 381 (D. Mass. 2008) (quoting Mass. Gen. Laws ch. 106, § 2–315). A product's "particular purpose" is different from its "ordinary purpose" in that it "envisages a specific use by the buyer which is peculiar to the nature of his business.'" Id. (quoting Mass. Gen. Laws ch. 106, § 2–315). Failure to allege that the product had a particular purpose "that differed from the purpose for which it was ordinarily used" is fatal to stating a viable claim. See Taupier, 490 F.Supp.3d at 444.

Here, Plaintiffs allege that the purpose of the apps was to enable covert recordings by law enforcement officers in a manner that complies with Massachusetts laws. [Am. Compl. ¶¶ 79–81, 109]. This is the same purpose as the "ordinary purpose" Plaintiffs allege for their implied warranty of merchantability claim. Plaintiffs do not allege any other purpose that is separate and apart from this ordinary purpose. Because Plaintiffs fail to allege that the intercepting devices were used "for a purpose that differed from the purpose which it was ordinarily used," the motion to dismiss Plaintiffs' breach of implied warranty of fitness for particular purpose claim is **<u>GRANTED.</u>** <u>See</u> <u>Taupier</u>, 490 F.Supp.3d at 444.

### G.    <u>Count VII: Massachusetts Wiretap Claim Against Motorola and Callyo</u>

Plaintiffs have sufficiently alleged that Motorola violated the Wiretap Act because it "aid[ed]" MSP in secretly hearing or recording the Plaintiffs without their knowledge or consent. Section 99C of the Wiretap Act prohibits the "willful[ ] … interception of any wire or oral communication," by any person, "except as specifically provided in a few narrow exceptions." <u>Curtatone v. Barstool Sports, Inc.</u>, 169 N.E.3d 480, 482, 482 n.4 (Mass. 2021); Mass. Gen. Laws ch. 272, § 99C. Under the act, "interception" "means to secretly hear, secretly record, *or aid another* to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Mass. Gen. Laws ch. 272, § 99B(4) (emphasis added). The act authorizes a private cause of action for:

> "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception . . . against any person who so intercepts, discloses or uses such communications or who so violates his personal, property or privacy interest."

Mass. Gen. Laws ch. 272, § 99Q.

Plaintiffs proceed primarily on a theory that Motorola aided MSP to secretly intercept their communications. The word "aid" is not defined by the Wiretap Act and Massachusetts courts have not specifically analyzed its meaning in case law. While the Wiretap Act has both criminal and civil applications, the SJC has held that the mens rea of "willful" that is required for the criminal provision of the statute does not extend to civil actions authorized by the Act. Pine v. Rust, 535 N.E.2d 1247, 1249 (Mass. 1989)[7] ("To be actionable under § 99 Q, then, an interception need not rise to the level of criminal conduct covered by the penal provisions of the law."); Gouin v. Gouin, 249 F. Supp. 2d 62, 79 (D. Mass. 2003) (denying motion to dismiss Wiretap Act claim). Instead, the Court will draw from civil common law and apply the elements of aiding and abetting a tort, which, under Massachusetts law, require Plaintiffs to show: (1) that the principal defendant committed the relevant tort; (2) that the aider or abettor knew the principal was committing the tort; and (3) that the aider or abettor actively participated in or substantially assisted in the principal's commission of the tort. Go-Best Assets, Ltd. v. Citizens Bank, 972 N.E.2d 426, 438 (Mass. 2012) (citing Arcidi v. NAGE, Inc., 856 N.E.2d 167, 174 (Mass. 2006); Restatement (Second) of Torts § 876 (b) (1977)).

Here, the principal defendant is MSP, and the relevant "tort" is the secret interception of any wire or oral communication, i.e. the conduct prohibited by the Wiretap Act. The Court notes here again that Judge LoConto of the Fitchburg District Court held extensive evidentiary hearings on this issue and concluded that MSP violated the Wiretap Act through its secret recordings of the

---

[7] In Pine v. Rust, the SJC affirmed liability under the Wiretap Act for defendants that not only included the principal person who actually made the secret recordings at issue, but also her brother, who merely loaned the principal his tape recorder in furtherance of the recording. 535 N.E.2d at 1249. Pine supports the proposition that liability under the Wiretap Act extends not only to those making a secret recording, but also to those who "aid" a violation by knowingly supplying the instrumentality or means by which the recording is made. Here, "knowledge" refers to knowledge that the instrumentality will be used to make a covert recording.

public utilizing the Callyo apps. See Commonwealth v. Aponte, No. 2216CR000495 [ECF No. 57-3 at 23 ("[t]hese recordings [made by MSP] were in direct violation of the wiretap statute.")]. Judge LoConto's finding supports Plaintiffs' allegations of the same. Regarding the second element, with their allegations surrounding the 2017 MSP-Motorola meeting, Plaintiffs sufficiently allege that Motorola knew, actually or constructively, that MSP was committing Wiretap Act violations through usage of the Callyo apps. [See Am. Compl. ¶¶ 50–53]. Additionally, Plaintiffs have sufficiently alleged the third element that Motorola substantially assisted MSP in violating the Wiretap Act by providing the intercepting devices through which MSP made the secret recordings and by maintaining/storing the recordings on the cloud. [See id. ¶¶ 24, 26, 28–29]; see also Commonwealth v. Du, 219 N.E.3d 843, 854 (Mass. App. Ct. 2023) (finding transmission and storage of the recordings on the cloud was a form of "interception" under the Wiretap Act).

Accordingly, the Court finds that Plaintiffs have put forth a sufficient factual basis to withstand Motorola's motion to dismiss Count VII and the motion is **DENIED.**

### H.    Count VIII: M.G.L. c. 272, section 99 Claim Against Defendant Noble

Plaintiffs have requested to voluntarily dismiss this claim without prejudice. [ECF No. 57 at 2] ("Plaintiffs voluntarily dismiss without prejudice Count VIII against Mawn for violation of the Massachusetts Wiretap Act, M.G.L. c. 272, § 99 (the "Wiretap Act") now that the MSP have affirmatively stated that it is not consenting to have all claims against them brought in this single federal lawsuit."). As a result, Defendant Noble's motion to dismiss is **moot** as to Count VIII.

### I.    Count IX: Section 1983 Claim Against Defendant Noble[8]

---

[8] As stated *supra*, FN 1, since Colonel Mawn is no longer Superintendent of MSP, this Court automatically substituted Colonel Geoffrey D. Noble, Mawn's successor in interest, for purposes of the official capacity claims. [ECF No. 44].

In his motion to dismiss, Defendant Noble asserts four reasons why Plaintiff's Section 1983 claim fails. First, Noble contends that the Eleventh Amendment bars Plaintiffs' claim. [ECF No. 53 at 1]. Second, Noble contends that Plaintiffs lack standing to assert the constitutional violations they allege. [Id.] Third, Noble contends that Plaintiffs' claim fails on the merits. [Id.]. Finally, Noble contends that he is entitled to qualified immunity. [Id. at 2]. The Court will take each in turn.

### 1. The Eleventh Amendment Does Not Bar Plaintiffs' Claim

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The amendment "has been construed to bar all suits against a state for damages in the federal courts, regardless of the citizenship of the plaintiff." Cline v. Burke, 682 F. Supp. 3d 125, 131 (D. Mass. 2023) (citing Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996); Hans v. Louisiana, 134 U.S. 1, 15 (1890)); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citations omitted). The Eleventh Amendment "also bars suits in federal court against states and state officers alleging violations of state law, regardless of the form of relief sought." Canales v. Gatzunis, 979 F. Supp. 2d 164, 173 (D. Mass. 2013).

State sovereign immunity is not absolute. "States may consent to suit in federal court, and, in certain cases, Congress may abrogate the States' sovereign immunity." Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990) (citations omitted). Moreover, a plaintiff may

also seek prospective relief against state officials acting in violation of federal law under the principles set forth in Ex parte Young. Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004).

As such, Plaintiffs can establish the Court's subject matter jurisdiction over the claim against Defendant Noble only if they can show (1) that Congress has abrogated the Commonwealth's sovereign immunity, (2) that the Commonwealth waived its sovereign immunity, or (3) that they are seeking prospective relief to remedy an ongoing violation of federal law.

It is undisputed that Section 1983 does not abrogate the Commonwealth's sovereign immunity. See Quern v. Jordan, 440 U.S. 332, 341 (1979) ("[W]e simply are unwilling to believe . . . that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States."). Because state officials acting in their official capacity are considered an extension of the state, Noble is entitled to sovereign immunity and cannot individually constitute a "person" under Section 1983. See Will, 491 U.S. at 71 (holding that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). Therefore, Congress has not abrogated the Commonwealth's immunity.

"The Eleventh Amendment also bars suits in federal court against states and state officers alleging violations of state law, regardless of the form of relief sought[,] . . . unless the state has waived its immunity." Canales, 979 F. Supp. 2d at 173. Defendant Noble has asserted immunity and indicated the state is not waiving its immunity. [ECF No. 54 at 1–2].

Plaintiffs still have a path forward. "While the Eleventh Amendment prohibits a party from bringing suit against a state in federal court, it does not prohibit a party from bringing suit against a state officer in federal court for prospective declaratory or injunctive relief under federal law." Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores

Galarza, 484 F.3d 1, 24 (1st Cir. 2007) (first internal citation omitted) (citing Ex parte Young, 209 U.S. 123, 155 (1908)). Ex parte Young thus provides an exception to the Eleventh Amendment's jurisdictional bar "in cases where prospective declaratory or injunctive relief is sought under federal law.'" Mills v. Maine, 118 F.3d 37, 54 (1st Cir. 1997). Ex parte Young's exception is focused on a prospective remedy; it does not permit "judgments against state officers declaring that they violated federal law in the past" or any other claims for "retrospective relief," including damages. P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 145–46 (1993) (citing Green v. Mansour, 474 U.S. 64, 73 (1985)).

Here, Plaintiffs are seeking prospective declaratory or injunctive relief under federal law. As discussed below, Plaintiffs have plausibly alleged their prospective injunctive relief, thereby overcoming the Eleventh Amendment's immunity provisions and establishing standing for their Section 1983 claim.

### 2. The Plaintiffs Have Standing to Bring Their Claim

Defendant Noble contends that Plaintiffs lack standing to bring this claim because Plaintiffs have failed to allege that their injury is fairly traceable to MSP's actions. [ECF No. 54 at 7]. To establish Article III standing, Plaintiffs "must demonstrate (1) an injury in fact which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,' (2) that the injury is 'fairly traceable to the challenged action,' and (3) that it is 'likely . . . that the injury will be redressed by a favorable decision.'" Massachusetts v. United States Dep't of Health & Hum. Servs., 923 F.3d 209, 221-22 (1st Cir. 2019) (quoting Lujan, 504 U.S. at 560). To establish the second element of the test for Article III standing, causation, Plaintiffs must "show a sufficiently direct causal connection between the challenged action and the identified harm." Katz, 672 F.3d at 71 (citing Lujan, 504 U.S. at 560). To establish the final element, redressability, Plaintiffs must

"show that a favorable resolution of [their] claim would likely redress the professed injury." Id. at 72.

Plaintiffs bring their claim under Section 1983 for "violation of constitutional rights secured by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution" (Count IX). [Am. Compl. ¶¶ 154–84]. As an initial matter, Plaintiffs withdrew "any claim that Count IX is based on a violation of the Fifth Amendment," which would have failed because Defendant Noble is not a federal actor. [ECF No. 57 at 8, n. 6]. Therefore, Plaintiffs are only proceeding on the basis that Defendant Noble violated their Fourteenth Amendment right to procedural due process and Sixth Amendment right to confrontation and effective assistance of counsel (through fair trial principles). [Id. at 8–9; Am. Compl. ¶¶ 6–8, 33, 154–84]. Plaintiffs allege MSP made surreptitious recordings of them, used the recordings in criminal investigations of the Plaintiffs, and failed to disclose the existence of the recordings to the Plaintiffs during their criminal prosecutions. [ECF No. 57 at 8; Am. Compl. ¶ 33]. More specifically, Plaintiffs allege that MSP violated their rights "to be presented with evidence against them, [to] confront their accusers, and [to] enjoy a fair and impartial trial." [Am. Compl. ¶ 167]. As injuries, Plaintiffs claim the deprivation of liberty and property interests as a result of their criminal prosecutions. [Id. ¶ 67].

Noble argues that Plaintiffs cannot satisfy the causation element because their injury resulting from their criminal charges and disposition cannot be traced to the unlawful recordings, when such recordings were never introduced during the Plaintiffs' criminal cases. [ECF No. 54 at 8]. However, it is MSP's intentional withholding of evidence that resulted in Plaintiffs' injuries. "[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). The duty imposed on

prosecutors under <u>Brady</u> "has always applied equally to . . . law enforcement officers." <u>Drumgold</u> <u>v. Callahan</u>, 707 F.3d 28, 38, 50 (1st Cir. 2013) (citing <u>Haley v. City of Boston</u>, 657 F.3d 39, 50 (1st Cir. 2011)).

 To establish a claim under <u>Brady</u>, a plaintiff must show three elements are met: "(1) the evidence at issue must be favorable to the accused, *either* because it is exculpatory, *or* because it is impeaching; (2) that evidence must have been suppressed by the government either willfully or inadvertently; and (3) prejudice must have resulted." <u>United States v. Paladin</u>, 748 F.3d 438, 444 (1st Cir. 2014) (emphasis added) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999)). When the suppressed evidence is impeaching, it must be material to serve as the basis for a <u>Brady</u> violation. <u>Paladin</u>, 748 F.3d at 444 (quoting <u>Conley v. United States</u>, 415 F.3d 183, 188 (1st Cir. 2005)). "Evidence is material when a 'reasonable probability [exists] that the result of the trial would have been different' if the suppressed evidence had been disclosed." <u>Paladin</u>, 748 F.3d at 444 (alteration in original) (quoting <u>Strickler</u>, 527 U.S. at 289). "Reasonable probability does not require that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." <u>Paladin</u>, 748 F.3d at 444 (internal quotation marks and citation omitted). Accordingly, "reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal." <u>Paladin</u>, 748 F.3d at 444 (quoting <u>Conley</u>, 415 F.3d at 188). "Once a <u>Brady</u> violation has been shown, the causation inquiry in a § 1983 [] suit is only a 'but for' inquiry pursuant to the preponderance of the evidence standard." <u>Drumgold</u>, 707 F.3d at 50.

 Plaintiffs have alleged a <u>Brady</u> injury that is fairly traceable and caused by MSP's conduct. The Plaintiffs plead that MSP made and used the recordings in furtherance of criminal

investigations. [Am. Compl. ¶ 34]. As Fitchburg District Court Judge LoConto found, "the MSP had actual knowledge that the recordings were made and being made, and they were aware of their obligation to turn said recordings over to the Worcester DA's Office." Mem. & Order, Commonwealth v. Aponte, No. 2216CR000495, [ECF No. 57-3 at 33]. Judge LoConto reasoned that such "lack of disclosure by the MSP prevented defendants and their counsel from having the ability to properly investigate their cases" and that an ability to investigate would have revealed two issues: "identity and entrapment." [ECF No. 57-3 at 28]. A criminal prosecution begins with an investigation, and a focus on a particular subject begins with identification of that subject during the investigatory stage. The Supreme Court has acknowledged as much in extending the Fifth Amendment right against self-incrimination beyond "mere[] . . . evidence which may lead to criminal conviction," but also to "information which would furnish a link in the chain of evidence that could lead to prosecution." Maness v. Meyers, 419 U.S. 449, 461 (1975) (citing Hoffman v. United States, 341 U.S. 479, 486 (1951)). Here, Judge LoConto found that the MSP identified at least some of the defendants in the Callyo cases using screenshots from the videos recorded on the apps, and that "identification would not have been possible without these videos." Commonwealth v. Aponte, No. 2216CR000495, [ECF No. 57-3 at 29]. Because MSP intentionally failed to disclose the Callyo recordings to the prosecutors and defendants including the Plaintiffs, MSP obstructed Plaintiffs' ability to challenge key evidence from the investigations that ultimately led to their criminal prosecutions. The disclosure of the recordings would have allowed Plaintiffs to potentially impeach witnesses about the circumstances concerning MSP's identification of the Plaintiffs as criminal suspects. Plaintiffs' identifications from the video recordings were material to their convictions because – had the recordings been disclosed – it may have resulted in a different outcome in Plaintiffs' prosecutions, particularly if the identifications were suppressed as

a result of their challenge to the evidence. See Paladin, 748 F.3d at 444. But–for MSP's failure to disclose the recordings, Plaintiffs could have impeached this evidence. That MSP hid the recordings "undermine[s] confidence in the outcome of [Plaintiffs'] trial[s]." See id. Therefore, MSP's conduct in making the covert recordings and failing to disclose them in Plaintiffs' prosecutions caused the due process injuries alleged by Plaintiffs.

Defendant Noble also contends that the recordings could not have violated Plaintiffs' Sixth Amendment rights because they were never "presented against Plaintiffs, used as evidence, and were not a part of any trials or other proceedings." [ECF No. 54 at 12]. However, as discussed earlier, it is this withholding that deprived Plaintiffs of their rights to face the evidence against them, to investigate their cases, and to have a fair trial. Brady does not only implicate due process under the Fourteenth and Fifth Amendments, it also bears on "the Sixth Amendment right to the effective assistance of counsel and the Fifth Amendment right to confront witnesses." United States v. Snell, 899 F. Supp. 17, 20 (D. Mass. 1995). Indeed, the protections of these amendments "would be hollow without Brady disclosures." Id. Disclosure of Brady material "is important, if not essential, to the defense's ability to mount a defense. . . . [the] information affects the defense investigation, how it will allocate its resources, the voir dire questions the defense will seek, the framing of opening statements, the nature of the pre-trial research on evidentiary issues and jury instructions, in short, all of the strategic decisions which must be made long in advance of trial." Id. The Sixth Amendment protects an "accused's right, in a criminal trial, 'to be confronted with the witnesses against him' and 'to have compulsory process for obtaining witnesses in his favor.'" United States v. DeCologero, 530 F.3d 36, 73 n.19 (1st Cir. 2008) (quoting U.S. Const. amend. VI). MSP's covert recordings of Plaintiffs and its failure to disclose the recordings made it impossible for Plaintiffs to confront any witnesses that may have been part of their identification.

Additionally, as discussed *infra* regarding the Compulsory Process Clause of the Sixth Amendment, Plaintiffs have sufficiently alleged that, as a result of MSP's actions, they were deprived of their rights to confront the evidence against them and have counsel effectively represent them in a fair trial.

Further, Plaintiffs allege that MSP's conduct is ongoing – that MSP continues to maintain and use covert Callyo recordings in criminal investigations. [ECF No. 57 at 8; Am. Compl. ¶ 184]. The Court finds this allegation plausible. First, neither MSP nor Motorola have stated that MSP no longer contracts with Motorola to use the Callyo apps, or that MSP has stopped its use of the Callyo apps or recordings made on the apps. When asked directly if MSP has "gotten rid of" the Callyo apps, counsel for MSP said "I don't know[.]" [Hr'g Tr. 35:10–12]. When asked if MSP has gotten rid of the evidence recorded through the apps or the ability to record surreptitiously, counsel for MSP evaded the question and stated, "I think that's irrelevant." [Id. 35:10–16]. Until there is proof or an unequivocal statement from MSP that it has completely terminated the use of the Callyo apps for covert recordings and that every single covert recording already made has been disclosed in any relevant criminal proceeding, the threat that MSP will engage in the same conduct against Plaintiffs and others similarly situated is a live issue. It is not as if Plaintiffs lead their lives with signs over their heads indicating their cases were implicated in the MSP audit of officers' use of the Callyo apps. In other words, MSP's past alleged injuries against Plaintiffs do not offer Plaintiffs any protection from the same conduct being repeated against them. To an MSP officer in the field, Plaintiffs are like any other member of the public, and until MSP unequivocally terminates the Callyo app recording features, Plaintiffs and putative class members could be subject to the same practices again. Further, Plaintiffs point out that MSP is presently continuing obstruct efforts to unravel the scope of the Callyo recordings by "failing to respond to public records requests,

discovery orders, and trial summons concerning the use of the [10-21 app]." [ECF No. 57 at 4–5]. Taking the allegations of the Amended Complaint as true, Plaintiffs have sufficiently alleged a risk of future injury.

Regarding redressability, Plaintiffs have plausibly shown "that a favorable resolution of [their] claim would likely redress the professed injury." Katz, 672 F.3d at 72. Plaintiffs plead "injunctive relief" and argue that the Court should "grant such other and further relief as is just and proper." [Am. Compl. ¶ 184, p. 24]. Drawing all inferences in the Plaintiff's favor, the injunctive relief they are seeking is for MSP to stop the conduct that Plaintiffs complain of – the use of the Callyo apps to make surreptitious recordings of the public, and MSP's failure to disclose covert recordings made with the Callyo apps in criminal prosecutions. MSP argues that Plaintiffs' allegations of injunctive relief are not particular enough to state a claim; however, MSP's challenge "is premature at this stage." Trailblazhers Run Co. v. Bos. Ath. Assn, No. 1:24-cv-10950-IT, 2025 U.S. Dist. LEXIS 51433, at *31 (D. Mass. Mar. 20, 2025) (citing Labonte v. Riverside Park Enterprises, Inc., 2022 U.S. Dist. LEXIS 213367, 2022 WL 17253663, at *5 (D. Mass. Nov. 28, 2022) ("A Rule 12(b)(6) analysis tests the plausibility of claims, and remedies are not claims.") (citation omitted)). The injunctive relief described above would cease MSP's use of the Callyo apps in covert recordings and would prevent MSP from unlawfully withholding evidence from the recordings in criminal prosecutions. Thus, Plaintiffs have established the final prong of standing for their Section 1983 claim: redressability.

In sum, Plaintiffs have met their three-pronged burden to establish standing. Further, that they are seeking prospective injunctive relief as described in the discussion on redressability above, *supra*, Plaintiffs can overcome Defendant Noble's Eleventh Amendment sovereign immunity challenge under the exception laid out in Ex Parte Young. See Asociación De

Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio, 484 F.3d at 24 (citing Ex parte Young, 209 U.S. at 155) (noting a party is not prohibited from bringing suit against a state officer in federal court for prospective declaratory or injunctive relief under federal law).

### 3.  *The Plaintiffs Have Sufficiently Plead a Claim*

For the same reasons that Plaintiffs have standing to assert their Section 1983 claim, they also have alleged sufficient facts to state a claim to withstand a motion to dismiss. Plaintiffs have met their burden on proceeding with their procedural due process claim under their Brady theory, as discussed above, *supra*. In terms of stating a claim for a violation of their Sixth Amendment rights, Plaintiffs are able to meet their burden under the same analysis as their procedural due process claim.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . , the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690–91 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485(1984) and (collecting cases)). Further, "[t]he Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment" Strickland v. Washington, 466 U.S. 668, 684–685 (1984). The Sixth Amendment protects both the right of confrontation and the right of compulsory process. U.S. Const. amend. XI.[9] Plaintiffs' claimed injuries fall most squarely under the Compulsory

---

[9] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. XI. Both Clauses are made obligatory on the States by the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403–06 (1965) (Confrontation Clause); Washington v. Texas, 388 U.S. 14, 17–19 (1967) (Compulsory Process Clause).

Process Clause, which provides criminal defendants "the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." United States v. Velazquez-Fontanez, 6 F.4th 205, 221-222 (1st Cir. 2021) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987)). Judge LoConto found that MSP Callyo recordings were, at least in some cases, used to identify defendants who were later prosecuted. Mem. & Order, Commonwealth v. Aponte, No. 2216CR000495, [ECF No. 57-3 at 28]. In challenging MSP's failure to disclose the Callyo recordings, Plaintiffs implicate their right to challenge the evidence that is facing them, i.e. "the right to put before a jury evidence that might influence the determination of guilt." Velazquez-Fontanez, 6 F.4th at 221-222 (quoting Ritchie, 480 U.S. at 56).[10]

In Pennsylvania v. Ritchie, the Supreme Court considered whether a defendant had a constitutional right to pretrial disclosure of confidential information. 480 U.S. 39. In reviewing Ritchie's claim, the Court noted the lack of clarity regarding how courts should analyze a claim under the Compulsory Process Clause and concluded that a claim brought pursuant to the Compulsory Process Clause is best analyzed under a Due Process analysis:

> This Court has never squarely held that the Compulsory Process Clause guarantees the right to discover the *identity* of witnesses, or to require the government to produce exculpatory evidence. But cf. United States v. Nixon, 418 U.S. 683, 709, 711 (1974) (suggesting that the Clause may require the production of evidence). Instead, the Court traditionally has evaluated claims

---

[10] Plaintiffs claim the liberty or property interest at issue for due process is the deprivation of liberty through being convicted and the monetary losses incurred through fines. [Am. Compl. ¶¶ 6–8, 67]. However, the Court notes that Plaintiffs may also have a due process interest in evidentiary material that was not disclosed to them, even when the import of that material on the outcome of their trials is unknown. See also Wade v. Brady, 460 F. Supp. 2d 226, 245 (D. Mass. 2006) ("The [Supreme] Court [in Arizona v. Youngblood] also held that defendants had a Due Process interest in 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' [] Bad faith destruction of such evidence violates the Constitution, even though its exculpatory value is highly uncertain.") (quoting Arizona v. Youngblood, 488 U.S. 51, 57 (1988))).

> such as those raised by Ritchie under the broader protections of the Due Process Clause of the Fourteenth Amendment. See United States v. Bagley, 473 U.S. 667 (1985); Brady v. Maryland, 373 U.S. 83 (1963). See also Wardius v. Oregon, 412 U.S. 470 (1973). Because the applicability of the Sixth Amendment to this type of case is unsettled, and because our Fourteenth Amendment precedents addressing the fundamental fairness of trials establish a clear framework for review, we adopt a due process analysis for purposes of this case. Although we conclude that compulsory process provides no greater protections in this area than those afforded by due process, we need not decide today whether and how the guarantees of the Compulsory Process Clause differ from those of the Fourteenth Amendment. It is enough to conclude that on these facts, Ritchie's claims more properly are considered by reference to due process.

480 U.S. at 56. As the Court has found that Plaintiffs plausibly allege a due process violation based on Brady, the same conclusion must follow that they have stated a claim for a Sixth Amendment violation based on the Compulsory Process Clause.

### 4.    Qualified Immunity Does Not Bar Plaintiffs' Claim

As a final line of defense, Defendant Noble raises that, even if this Court were to find Plaintiffs have stated a claim under Section 1983, the doctrine of qualified immunity would bar their claim. More specifically, Defendant Noble argues that "the conduct at issue does not implicate any 'clearly established' right to the discovery of evidence unfavorable to a criminal defendant that is not used in their criminal proceeding." [ECF No. 54 at 13].  However, because qualified immunity is an affirmative defense and because Defendant Noble's argument requires the court to examine the "conduct at issue," it is premature to consider this argument at a motion to dismiss stage. Alianza Ams. V. DeSantis,727 F. Supp. 3d 9, 55 (D. Mass. 2024) ("[A]s a general rule, 'the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion.'") (citations omitted); Chavez v. Zachowski, 2013 U.S. Dist. LEXIS 163008, at * 9 (D. Mass. Nov. 15, 2013) ("To the extent the defendants are seeking a ruling on the merits on their qualified immunity defense, their request is premature.").

Accordingly, Plaintiffs have sufficiently stated a Section 1983 claim by demonstrating that Defendant Noble violated Plaintiffs' Fourteenth Amendment right to procedural due process and Sixth Amendment rights. Thus, Defendant Noble's motion to dismiss Count IX is **<u>DENIED</u>**.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, the Defendants' motions to dismiss, [ECF Nos. 29, 53], are

**<u>GRANTED IN PART and DENIED IN PART.</u>**

**SO ORDERED.**

Dated: March 28, 2025

    /s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge